### GRAY v. McAFEE.

(Court of Appeals of District of Columbia. Submitted. January 9, 1922. Decided March 6, 1922.)

#### No. 1461.

Patents ⊕⇒90(7)—Letter by senior applicant to junior held not to disclose counts in interference.

In interference proceedings, concerning counts for a process for converting hydrocarbons of higher boiling points into naphtha by heating them in the presence of anhydrous aluminum chloride, in which the control of the vapor temperatures was the essence of the invention, a letter written by the senior applicant, to whom patents had been issued, to the junior applicant, suggesting experiments along that line, but specifying the hydrogenizer should not be mixed with the oil being cracked, which precluded the use of aluminum chloride, held not to disclose the counts in issue, so as to entitle the senior applicant to claim the work of the junior as his reduction to practice, especially where other applications by the senior applicant, after the experiments were made, did not claim the invention.

Van Orsdel, Associate Justice, dissenting.

Appeal from the Commissioner of Patents.

Interference proceeding between George William Gray and Aimer McDuffie McAfee. From a decision awarding priority to McAfee, Gray appeals. Affirmed.

J. Edgar Bull and R. J. Dearborn, both of New York City, for appellant.

Alfred M. Houghton and Melville Church, both of Washington, D. C., for appellee.

SMYTH, Chief Justice. From a decision of the Commissioner of Patents in an interference proceeding, Gray appeals. The contest is between an application of McAfee and patents·to Gray issued while McAfee's application was pending. The subject-matter of the interference relates to the conversion of higher boiling petroleum hydrocarbons into lower boiling petroleum hydrocarbons under certain conditions. There are eight counts of the issue, of which 1 and 6 are·examples.

1. The process of converting hydrocarbons having higher boiling points into naphtha, which consists in heating said hydrocarbons in the presence of anhydrous aluminum chloride to a temperature producing vapor having a temperature not substantially above the end boiling point of naphtha and maintaining them at such temperature.

6. The process of converting hydrocarbons having higher boiling points.into naphtha, which consists in heating said hydrocarbons in the presence of anhydrous aluminum chloride to a temperature producing vapor having a temperature above the end boiling point of naphtha, but below the end boiling point of illuminating oil, condensing the illuminating oil driven off in a preliminary cooling chamber, returning said oil to the still to be further acted on whereby ·higher boiling oil is converted into naphtha and conducting the naphtha driven off to a condenser.

Gray was successful before the Examiner of Interferences, but lost on appeal to the Examiners in Chief, whose decision was affirmed by the Commissioner. It is agreed by the three tribunals that the essence of the invention lies in a proper temperature control in the vapor line, and that the present process converts substantially all the higher boiling hydrocarbons into any desired specific lower boiling hydrocarbon, such, for example, as gasoline.

Gray and McAfee are highly trained chemists, and were employed by the Texas Company, which was engaged in producing and refining petroleum products. Gray says in his preliminary statement that he conceived and disclosed the invention as "early as November 5, 1912." He does not claim that he personally reduced it to practice, but asserts that what McAfee did in perfecting the process was done in accordance with a general plan disclosed by him to McAfee. From this it appears that the question to be solved is one of originality. Whether or not Gray should prevail must be determined by the consideration of a letter sent by him to McAfee on November 5, 1912. By that letter, he says, he disclosed to McAfee. No claim of a later disclosure is put forward by him. If, then, the letter did not disclose the invention, Gray cannot succeed.

The Examiner of Interferences found that it did; but, as we have said, the Examiners in Chief and the Commissioner held otherwise. With great thoroughness the Examiners in Chief analyzed the letter, and compared its disclosures with the claims of the issue. We do not think it necessary to do much more than follow in substance their opinion.

Gray wrote to McAfee on October 29, 1912, giving directions with respect to certain experiments which he desired him to carry out. He said that McAfee was evidently posted on all the literature relating to the subject, and that if he went ahead he would "probably accomplish something." McAfee responded, making some suggestions, part of which did not meet with Gray's approval. The latter then wrote the letter of November 5, in which he advised that McAfee take some tar or residuum from Oklahoma crude, and place it in a small experimental still, but gave no intimation that aluminum chloride, or any other catalyst, should be mixed with it. He recommended that the vapor line be so placed that the vapor would have to pass up through probably 8 or 10 feet of pipe before reaching the condenser, and that the oil in the still be held at a temperature of 625 to 675° F. He thought that, if his suggestion was followed, it would produce cracking, and that the product passing over through the vapor line would be light hydrocarbon having a gravity lighter than 50° Beaume. He further said that the pipe should slope upward, so that nothing which condensed in it would reach the condenser, but would return to the still. The still, according to him, was to be held at the temperature specified for at least 48 hours, and, if this was done, he said, the distillate thrown over would contain a very large percentage of cracked products, which should be hydrogenized very rapidly. The plan thus outlined by Gray is nothing more than a cracking process to be followed by hydrogeniza-tion. This is emphasized by his further statement that:

279 F.—12

"The distillates can probably be hydrogenized by passing a catalyzing agent in that part of the vapor line furthest from the fire, keeping this part of the line at a temperature of probably 350 degrees F."

This is all upon which he bases a disclosure of that feature of the invention which requires the maintenance in the vapor line of a temperature not substantially above the end boiling point of naphtha. But we do not think it is open to such an interpretation. What he writes about is hydrogenization, and if the specific temperature mentioned has any significance it can only be in connection with the process of producing a hydrogenized product, which is not the matter in issue here.

It should also be borne in mind that Gray is not discussing a process in which a catalyst is mixed with the oil in the still, for he specifically states that the catalyzing agent should be placed in that part of the vapor line furthest from the fire. He does not suggest a temperature below 350° F., either for the purpose of preventing the catalyst from passing over to the condenser with the light hydrocarbons or for the purpose of allowing the naphtha products to pass over while the higher boiling products condense and flow back to the still. Nor does he advise the use of aluminum chloride as a catalyzing agent. As just noted, he does not direct that the catalyst shall be mixed with the oil in the still. Gray attempts to explain this by saying that any one skilled in the art of refining oil, as McAfee was, would know that, if aluminum chloride was to be employed as a catalyst, it should be placed in the still. But he (Gray) directs that the catalyzing agent should be placed at a point in the vapor line furthest from the fire. However, it is clear that Gray's letter does not mention the substance aluminum chloride, called for by all of the interference counts, and is specific to a mode of procedure different from that of the issue and involving the use of a catalyst other than that employed in the process in issue.

After stating that the process should be continued 48 to 60 hours, with a constant temperature, the letter concludes by saying:

"You will thus obtain some cracked distillates, which will give you an idea of what they look like, how they smell, how they react with sulphuric acid, and when you receive your materials you will know better what is taking place."

The products mentioned in this quotation appear to be what would be produced by the treatment of heavy oils in the absence of a catalyzing agent. Finally, this letter discloses nothing in such detail as would enable McAfee to work out the process of the issue without invention.

Admittedly the invention was reduced to practice by McAfee during the month of December, 1912, and there is evidence that Gray saw demonstration of it on or about the 22d of that month. Prior to that Gray had been informed over the telephone by McAfee of a successful test of the invention, which occurred about December 11 or 12. Gray does not deny this, but, as we have said, claims that what McAfee did by way of reducing it to practice inured to his benefit. In other words, he relies upon McAfee's reduction to practice had about the 11th or 12th of December.

Now happens a very significant thing: On January 23, 1913, a little over a month after McAfee's reduction to practice, Gray filed two applications for patents on this subject-matter; yet he does not say one word in either about vapor control, which, as we have remarked, is conceded to be the essence of the invention. On the contrary, he describes therein the mixture of gas, oil, and anhydrous aluminum chloride in the still. In one he states that the mixture is heated to a temperature not substantially above 325 to 350° F., and in the other not substantially above the end boiling point of naphtha. Thus the applications remained until January 22, 1915, nearly two years, when they were amended to aver a control of vapor temperature. If Gray had the invention on the 5th of November, it seems incredible that he would not have embodied in his applications the idea of temperature control of the vapors in the vapor line. We do not think he possessed it at that time. He knew what he wanted, but did not know how to get it. McAfee, independently of him, conceived and reduced to practice the process by which to achieve the desired end, and is entitled to priority.

The decision of the Commissioner of Patents was right, and it is affirmed.

Affirmed.

VAN ORSDEL, Associate Justice (dissenting). I am unable to agree with my Associates in the conclusions reached in this case.

All the apparatus used by McAfee in conducting his successful experiments, as well as that shown in his application, were constructed and operated essentially as described in Gray's letter of November 5th. A careful reading of this letter, in the light of the conversations and correspondence preceding it, demonstrates that Gray had a clear conception of the means of accomplishing the result. Much is attempted to be made of a sentence of the letter to the effect that "the distillates can probably be hydrogenized by passing a catalyzing agent in that part of the vapor line furthest from the fire." If Gray had added the injunction that, when aluminum chloride is used as a catalyst, it should be mixed with the oil in the still, instead of placed in the vapor line, a fact concededly known to both at the time the letter was written, his disclosure would have been complete. But Gray had not in mind any particular catalyzing agent, since by his direction a number had been ordered by McAfee, with which experiments were to be made.

It must be remembered that the breaking of oil was old in the art, as well as the making of gasoline by condensation. The whole invention here was to construct an apparatus in which condensation would take place at a point productive of the largest percentage of gasoline; in other words, locating a condensation point sufficiently distant from the fire that the temperature would be 350 degrees. Such an apparatus was described in Gray's letter of November 5th. It is the apparatus shown as Gray's Exhibit A, sketched by McAfee on the witness stand. It shows a reflux or air-cooled condenser, with a thermometer located at the top of the condenser to maintain a constant temperature of 350 degrees, all as described in Gray's letter.

This is the apparatus shown in Gray's patents in interference, as the applications were originally filed.

McAfee, a learned chemist, but with little or no knowledge of treating oils, was working under the supervision and direction of Gray. All information which he possessed on the subject he had derived in conversation or by correspondence with Gray. Gray, in his letter of November 5th, described the apparatus to be used in accomplishing the desired result, and advised McAfee as to the method of experimenting with it. It therefore results that anything derived from those experiments is the invention of Gray, and not McAfee.

The Examiner of Interference, after a thorough analysis of the testimony, reached a conclusion which in my opinion epitomizes this case:

"From the evidence submitted it is concluded that, during the time when the invention in controversy was developed, McAfee was under the immediate supervision of Gray and was responsible to him directly; that Gray disclosed the plan of the invention to McAfee; that what McAfee did in developing the said process was no more than the duty of his position required of him, and was in accordance with the plan outlined and suggested to him by Gray; and that what McAfee did under those conditions inures to Gray under the well-established principle of law enumerated and reiterated in the decision indicated above"—citing a number of decisions from this court.

Whatever mistakes Gray may have made in filing his applications are beside the case, since McAfee was not an original inventor, and therefore in no position to profit by Gray's mistakes. Gray, therefore, should be awarded priority.